**GULF OIL CORPORATION,**
**Plaintiff,**

v.

**FEDERAL ENERGY ADMINISTRATION and Frank G. Zarb, Administrator of the Federal Energy Administration.**

**Civ. A. No. 75–157.**

United States District Court,
W. D. Pennsylvania.

Feb. 26, 1975.

C. Arthur Wilson, Jr., Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., Jesse P. Luton, Jr., and Catherine McCulley, Houston, Tex., for plaintiff.

Joel Strauss, Asst. U. S. Atty., Pittsburgh, Pa., Penny Blair, Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

SNYDER, District Judge.

The Gulf Oil Corporation filed its Complaint seeking a declaratory judgment and injunctive relief as to certain actions of the Defendants taken under the Emergency Petroleum Allocation Act of 1973 (EPAA), Public Law No. 93–159, 15 U.S.C. § 751 et seq. Under a cost equalization program of the Federal Energy Administration (FEA) there were promulgated regulations requiring the purchase or sale of "Entitlements" which are the right to include one barrel of "old" domestic crude petroleum in a refiner's crude oil receipts or, in essence, the right to refine one barrel of "old" oil in that refiner's refineries. Pursuant to an Entitlement Notice, in January, 1975, Gulf was required to buy 775,693 Entitlements based on a national old oil supply ratio for November 1974 costing Gulf $3,878,465. These payments were made by Gulf under protest and in the face of the threatened imposition of daily penalties against Gulf by the FEA as set forth in the FEA's remedial Order dated January 29, 1975. Further, based on the December 1974 adjusted national old oil supply ratio, Gulf will be required to buy in February, 2,905,408 Entitlements for which it will be required to pay $14,527,040 to various refiners and nonrefiner eligible firms with Entitlements for sale. It is alleged that the actions of the FEA are not authorized under the EPAA, are an arbitrary and capricious exercise of administrative authority, unreasonable and irrational, and an abuse of discretion, by which there are imposed unconstitutional burdens upon Gulf. For the reasons hereinafter set forth, the preliminary injunction must be denied.

The record in this case will show that this Court commenced the Hearing on the motion of Gulf for a preliminary injunction on February 5, 1975. On that date, the hearing was recessed pending a decision by the Temporary Emergency Court of Appeals (TECA) on the request for a stay by Exxon Corporation in its suit against the FEA attacking the validity of the Entitlement program. At that time it was stipulated between the attorneys for the Plaintiff and the Defendants in this case that if the TECA granted Exxon a stay or any form of injunctive relief, a preliminary injunction would be entered for Gulf by this Court, but if Exxon were denied a stay or any form of injunctive relief the hearing on Gulf's motion for preliminary injunction in this case would resume, at which time Gulf would be given the opportunity to present any additional evidence it may have in support of its motion. In the meantime, TECA has denied Exxon's request for a stay and at the same time dissolved a stay order issued by Chief Judge Tamm in a similar suit by Marathon Oil Company against the FEA.[1]

---

1. Counsel have further represented to the Court that Chief Justice Burger has also denied a Stay application presented by Exxon.

On February 24, 1975, the hearing in this case was resumed and the record completed by the filing with this court of a supplemental affidavit of J. L. Schweizer and the affidavit of E. F. Eisemann, Jr., both in support of Plaintiff's motion for preliminary injunction, and a supplemental memorandum of points of authorities in support of plaintiff's motion. Extensive oral argument was had and after consideration of the entire record, the court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Gulf Oil Corporation (Gulf) is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, with its principal office and place of business in the Gulf Building, 439 Seventh Avenue, Pittsburgh, Allegheny County, Pennsylvania.

2. Gulf is engaged in the business of producing and refining crude oil in the United States and elsewhere, and in marketing in the United States crude oil and petroleum products, including motor gasoline, diesel fuel, fuel oil, and heating oil.

3. Gulf obtains a substantial amount of its crude oil from its own producing properties located in the United States in the development of which there is involved large investments of money. Gulf also refines in its United States refineries, oil from producing properties located outside the United States.

4. Gulf has substantial operations for the marketing of motor gasoline, diesel fuel, heating oil, fuel oil and other petroleum products in the United States.

5. Defendant, Federal Energy Administration (FEA) is an agency and an instrument of the United States under the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 et seq.; and was established by Executive Order No. 11,790 (June 27, 1974). The FEA is charged with the responsibility for the administration of the Emergency Petroleum Allocation Act of 1973 (EPAA), signed into law by the President on November 27, 1973.

6. Defendant Frank G. Zarb, is the Administrator of FEA under the authority delegated by the Executive Order hereinabove set forth.

7. Under EPAA there is to be a promulgation of regulations by the President or his delegate for the specification of prices and the mandatory allocation of, crude oil, residual fuel oil, and refined petroleum products in or imported into the United States. (§ 4(a)).[2] These regulations were to implement "to the maximum extent practicable", the objectives set forth in § 4(b)(1) of EPAA.[3]

---

2. Section 4(a) provides:
"Not later than fifteen days after [the date of enactment of this Act,] the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (f), such regulation shall take effect not later than fifteen days after its promulgation. Except as provided in subsection (e) such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States."

3. Section 4(b)(1) provides:
"The regulation under subsection (a), to the maximum extent practicable, shall provide for—

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

8. In particular the regulations were to provide for the protection of public health, safety and welfare; maintenance of all public services, maintenance of agricultural operations; preservation of an economically sound and competitive petroleum industry, including in particular, competitive viability of independent refiners, small refiners, non-branded independent marketers, and branded independent marketers; the allocation of crude oil for refiners in the United States to enable such refiners to operate at full capacity; equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including the minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms (competition).

9. The President then established the Federal Energy Office which adopted certain fuel allocation rules which were revised by the FEO on January 14, 1974, when it issued the Petroleum Allocation and Price Regulations (39 F.R. 1924 et seq.).

10. Under FEA price regulations pertaining to the pricing of crude oil, a two-tier pricing system was adopted by which the prices of "old" domestic crude petroleum were frozen at the highest posted price in effect on May 15, 1973, plus $1.35, amounting to approximately $5.25 per barrel.

11. The freeze on the prices of "old" domestic crude petroleum applied to the volume of crude petroleum produced and sold from a property during the corresponding month of 1972 (except "Stripper").[4] Crude oil produced in excess of 1972 production levels from the same property ("new" oil) is exempt from price controls, and each barrel of new oil produced releases from price controls a barrel of old oil ("released" oil).

12. In addition, so-called "released" crude, could be sold at a price in excess of the old oil price; this was permitted to be sold at the free market price or at the formula price, 10 C.F.R. § 212.74(b) whichever is lower.

13. Under the FEA published comprehensive petroleum allocation and pricing regulations issued January 14, 1974, allocation was accomplished by requiring all supplier/purchaser relationships for the sale and exchange of crude oil as they existed on December 1, 1973 generally to remain in effect (10 C.F.R. § 211.63), by requiring large integrated refiners such as Gulf to allocate a portion of their crude to small and independent refiners (10 C.F.R. § 211.65).

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;
(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;
(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;
(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;
(H) economic efficiency; and
(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms."

4. Section 4(e)(2)(A) provides:
"The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well."
This applies to the production from so-called "Stripper" wells.

14. On August 30, 1974, the FEA published a notice of proposed rule making and public hearing with a special cost equalization program by the use of "Entitlement".

15. FEA then amended its regulations on December 4, 1974, by promulgating the Cost Entitlement Program (C.E.P.), 39 F.R. 42246, under which refiners and non-refiner eligible firms were required to submit information whereby FEA could calculate the national "old" oil and crude oil receipts ratio and individual old oil to crude oil receipts ratio. A refiner was then issued a number of Entitlements equal to the national old oil ratio. To the extent that his old oil ratio exceeded the national old oil ratio, he was required to buy additional Entitlements from other refiners and eligible firms in order that his total Entitlements equal his total number of barrels of old oil. An Entitlement was the right to include one barrel of old domestic petroleum in a refiner's crude oil receipts in a particular month, or in essence, the right to refine one barrel of old oil in the refiner's refineries. Failure to purchase such Entitlements within the time period established by FEA could subject the refiners to civil and criminal penalties.

16. On December 10, 1974, FEA issued regulations which established the price of an old oil Entitlement at $5.00 per barrel for Entitlements to be purchased for the month of January.[5]

17. FEA also issued on January 13, 1975, the old oil Entitlement notice which established the adjusted national old oil supply ratio for November 1974 at .4105 and listed the amount of Entitlements which each refiner would be required to sell or purchase for the month of November (40 F.R. 2560, et seq.). The Entitlement notice further provided that the purchase must be completed by January 31, 1975 and refiners which fail to purchase Entitlements on or prior to January 31, 1975 would be directed by the FEA to purchase Entitlements as set forth in the Entitlement notice.

18. Pursuant to the Entitlement notice Gulf purchased 775,000 Entitlements at cost of $3,878,465 to refiners and non-refiner eligible firms, the major portion of which was paid to Texaco, Inc. and Amerada Hess its competitors. These payments were made by Gulf under protest and in the face of threatened imposition of daily penalties against the Plaintiff by the FEA set forth in FEA's remedial order dated January 29, 1975.

19. February 19, 1975, the FEA published the old oil Entitlement notice for December 1974 which established the adjusted national old oil supply ratio at .400295 and listed the amount of Entitlements which each refiner and non-refiner eligible firm would be required to sell or purchase for the month of December. Pursuant to such Entitlement notice, Gulf is required to purchase 2,905,408 Entitlements at a cost of $14,527,040 to refiners and non-refiner eligible firms with Entitlements for sale. Substantial payments may have to be made to Amerada Hess among Plaintiff's major competitors.

20. Under this program, Gulf will undoubtedly be required to purchase Entitlements and to pay similar amounts for future months.

21. Under this program, no crude oil changes hands but rather, a refiner such as Gulf is required to make substantial cash payments for the equalization of inequities brought about under the two-tier pricing system.

22. All refiners and importers who sell Entitlements are required to count their proceeds on Entitlement sales as a reduction in crude oil or product costs.

23. All refiners who buy Entitlements are permitted to count the cost thereof as an addition to crude oil costs. FEA rules further permit these increased crude oil costs to be passed through to the ultimate consumer on a dollar for dollar basis (the decision on

5. 39 F.R. 43103.

whether to pass the costs along is left to the individual refiner).

24. Gulf has failed to establish that it is likely to suffer irreparable harm as the basis for injunction, or indeed, that its costs associated with the Entitlement purchase for November and December or for future months cannot be recovered.

25. The evidence tends to show, to the contrary, that Gulf will be more protected with respect to crude oil costs and competition under C.E.P. than it would be if the price of domestic crude oil were not frozen.

26. Gulf does not make a convincing show of evidence that the passing through provision is not substantially and wholly beneficial, tending to minimize its injury. It is noted that while 100% recoupment of payments may not be possible, it does not, however, appear to be irreparable injury or damage to the Plaintiff.

27. The Order of January 29, 1975, directing Gulf to immediately comply with the Entitlement program and to purchase the Entitlements as set forth as well as the Entitlement notice of February 19, 1975 requiring the purchase of Entitlements were issued strictly in accordance with the authority of the FEA as conferred by statute and the actions taken thereunder were neither arbitrary or capricious, but were related to rational considerations of the crisis facing the country.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this action under Section 5(a)(1) of the Emergency Petroleum Allocation Act, which makes §§ 205–211 of the Economic Stabilization Act of 1970 (ESA) applicable to regulations promulgated under Section 4(a) EPAA.

■ Under Section 211(d) of the ESA, District Courts of the United States may enjoin, temporarily or permanently, the application of a regulation only if the regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful under the criteria (5 U.S.C. § 706(2)), and no order of such agency may be enjoined unless the final judgment determines that such order is in excess of the agency's authority or is based upon findings which are not supported by substantial evidence.

■ The Court determines that the mere fact that CEP does not provide for direct allocations of crude oil, residual fuel oil or any other refined petroleum product does not render the program invalid. Allocation may be brought about indirectly by calling for Entitlements (buy and sell) as well as directly by physical transfer requirements. CEP is thus an allocation program and within the statutory authorization.

■ Gulf contends that CEP is arbitrary, capricious and unsupported by substantial evidence. Here the issue becomes whether or not there is a rational basis for the decision of FEA to use CEP, and the Court's conclusion is in favor of FEA. Pacific Coast Meat Job. Ass'n. Inc. v. Cost of Living Council, 481 F.2d 1388 (T.E.C.A.1973). Mandel v. Simon, 493 F.2d 1239 (T.E.C.A.1974).

The CEP impresses this Court as being the product of a careful selection from many possible programs and the use of indexes of "old" oil supplies was clearly within the objectives found in Section 4(b) of EPAA.

■ As to Gulf's contention that CEP constitutes taking of property for private purposes without just compensation contrary to the Fifth Amendment to the Constitution of the United States, we find this argument to be without merit. Western States Meat Packers Ass'n. v. Dunlop, 482 F.2d 1401 (T.E.C.A.1973); Local Union No. 11, IBEW v. Boldt, 481 F.2d 1392 (T.E.C.A.1973). And there is no substantial constitutional question to be certified to the Temporary Emergency Court of Appeals, and this Court declines to certify such. Delaware Valley Apartment House Owners Ass'n. v. United States, 350 F.Supp. 1144 (E.D.Pa.1972), aff'd 482 F.2d 1400 (T.E.C.A.1973).

Counsel for Gulf has strenuously urged upon us that in light of Consumers Union of the United States, Inc. v. John C. Sawhill, Administrator of Federal Energy Administration decided by the Temporary Emergency Court of Appeals of the United States on February 18, 1975, that this Court must declare as unauthorized, CEP. However, we do not so read the Opinion as written by Judge Anderson. In that case, *Consumers Union* alleged that regulations 10 C.F.R. § 212.71–74 violated Section 4 of the Emergency Petroleum Allocation Act. Specifically, *Consumers Union* claimed that Section 4 of the Act imposed a mandatory duty to establish controls which would insure "equitable" prices for all domestic crude oil; and that FEA, by permitting new and released crude oil to be sold at the free market price, violated such statutory duty and in effect created a massive unauthorized exemption from the Act. After the United States District Court for the District of Columbia denied Consumers Union's motion for declaratory and injunctive relief and granted FEA's cross-motion for summary judgment, the Temporary Emergency Court of Appeals reversed the District Court which, while upholding FEA's released oil regulation (10 C.F.R. § 212.74(b)), then went on to say (p. 15):

> "It is not the function of this court to determine what the equitable price is, or should be. We merely hold that the President, through the FEA, by permitting the price of new crude oil to float at free market levels, has not struck any balance and, as a result, has failed to satisfy the requirement that prices be set at an equitable level."

It is apparent that the Temporary Emergency Court of Appeals was not, as urged by Gulf, declaring as unauthorized the two-tier pricing system but only that the formula relating to new oil was in effect no formula at all. In the instant case, it is admitted by all that the value of an Entitlement is determined in light of the barrel price of old oil, the market price of stripper well oil, the market price of imported crude oil, as well as the market price of new oil. In the use of this formula we do not in any way see a violation of the principles set forth in the majority opinion in *Consumers Union*. Gulf contends that in fixing the price of its Entitlement, FEA made a determination of the approximate difference between the old oil price and the new oil price and then arrived at the value of $5.00 per Entitlement. However, the Government has represented to the Court with agreement of counsel for the Plaintiff that while unquestionably the new oil price was taken into consideration, a determination was made of more than the difference between the old oil price and the new oil price as set forth above. We thus specifically hold that there is a valid basis for the $5.00 per Entitlement value fixed by the FEA in spite of the infirmity in the program pointed out by TECA in *Consumers Union*.

Counsel for Gulf in his supplemental memorandum argues to this Court that following the decision of TECA in *Consumers Union* the attorney for Consumers Union, Peter Schuck, was reported as stating that on the basis of the opinion of TECA, he would seek a court order requiring a refund by companies of all amounts which they had received for petroleum products insofar as such amounts are based upon the difference between the old oil price validly fixed by the FEA and the new oil price found by TECA to be invalid. However, as pointed out in the statement of the Government above, the fixing of the Entitlement's price is not based upon the difference between the old oil price and the new oil price. We do not conclude that this argument of Gulf is a sufficient basis on which this Court could grant a preliminary injunction.

Furthermore, Gulf has failed to establish that it has suffered or is likely to suffer irreparable harm in the event an injunction is denied. Gulf's claim of immediate irreparable harm is premised on the assumption that when it

was forced to meet its Entitlement obligation on January 31, 1975 and for the following months, that it will not be able to recover these Entitlement costs from the market place. It is argued that at least in the gasoline market, the Plaintiff is presently selling at, or slightly above its competitors' prices and that any additional costs will not be recoverable. However, the Court was impressed with the fact that Plaintiff's affidavits and exhibits ignored the effect of the CEP upon its competitors who will also be required to expend substantial sums in the purchase of Entitlements and which costs they similarly will be seeking to pass through in the market place. Until the competitors begin to readjust their product cost to include Entitlement cost, it becomes only speculative as to whether the Plaintiff will suffer any injury in the sense of having to absorb, rather than pass through to the market place, its Entitlement cost. Such speculative injury is not the basis of finding irreparable harm, Union Oil Company of California v. Federal Energy Administration, CV 74–1943–MML (CD California, filed July 25, 1974). Even if competition should preclude Gulf from passing through its increased costs, the question remains whether such a reduction in profit margin constitutes a legal harm. Such a reduction of profit margin results, we conclude, from a valid exercise of FEA's regulatory power under the Allocation Act and, therefore, the Plaintiff will not suffer irreparable harm that is legally or equitably cognizable under the CEP. In fact, the two-tier pricing system of control brought about a competitive advantage to Gulf and it is this competitive advantage which is equalized under CEP.

The evidence further tends to show that as a result of CEP Gulf is placed in a better position as respects crude oil costs and competition than it was before the price of domestic crude oil was frozen. In addition, the evidence shows that delaying the implementation of CEP caused by an injunction relating to Gulf alone would force the FEA to recalculate its whole crude oil program, a matter of vital public concern and thus the Plaintiff has failed to meet its burden to establish that the public interest would not be harmed by the issuance of the preliminary injunction sought.

As noted by Judge Walinski in Marathon Oil Company v. Federal Energy Administration, No. C 75–36 (N.D.Ohio, filed January 31, 1975), Gulf would seek to have this Court take on a detailed analysis of the very complicated market factors going into the problems connected with competition among refiners in crude oil. We have been enjoined not to do so. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L.Ed.2d 136 (1971). In finding that there was an adequate basis for FEA's regulations, this Court will not enjoin the program as to Gulf.

■ As to Gulf's constitutional challenge that CEP constitutes the taking of property for a private purpose without just compensation contrary to the due process clause of the Fifth Amendment, it is clear that this Court is without power to decide the issue. See § 211(c) of ESA. This Court could certify such a question to the Temporary Emergency Court of Appeals if it found the question to be substantial but such question is not substantial and plainly without merit for previous Court decisions have foreclosed the subject (Marathon Oil Company v. FEA, *supra*) Delaware Valley Apartment House Owners Association v. United States, *supra*. Hence, this Court finds no substantial constitutional question and declines to certify such to the Temporary Emergency Court of Appeals. For all of the foregoing reasons, Plaintiff's motion for a preliminary injunction is denied. The cause is continued for such further proceedings as may be necessary.

It is so ordered.