**EXXON CORPORATION and Esso Standard Oil S. A., Ltd., Plaintiffs,**

v.

**FEDERAL ENERGY ADMINISTRATION et al., Defendants,**

**United States of America and Commonwealth Oil Refining Company, Intervenor-Defendants.**

**MOBIL OIL CORPORATION and Mobil Oil Caribe, Inc., Plaintiffs,**

v.

**FEDERAL ENERGY ADMINISTRATION et al., Defendants,**

**United States of America et al., Intervenor-Defendants.**

**TEXACO, INC., and Texaco Puerto Rico, Inc., Plaintiffs,**

v.

**FEDERAL ENERGY ADMINISTRATION et al., Defendants,**

**United States of America and Commonwealth Oil Refining Company, Intervenor-Defendants.**

**Civ. A. Nos. 74-1617, 74-1658 and 74-1705.**

United States District Court, District of Columbia.

June 17, 1975.

Donovan, Leisure, Newton & Irvine, Andrew J. Kilcarr, Washington, D.C., Allan R. Freedman, Donovan, Leisure, Newton & Levine, New York City, for Mobil Oil & Mobil Oil Caribe, Inc.

Carla A. Hills, Stanley D. Rose, Paul T. Michael (main counsel), Christopher Was, U.S. Dept. of Justice (Economic Stabilization Section), Washington, D. C., Ezra Levine, FEA, Robert E. Montgomery, Gen. Counsel, FEA, Washington, D. C., for FEA and Administrator of FEA and United States.

Yynn R. Coleman, Michael J. Henke, Washington, D.C., for Commonwealth of Puerto Rico.

John F. Graybeal, F. Anthony Maio, Benton L. Becker, Arthur Amdur, Washington, D.C., for CORCO.

Michael A. Schlanger, William H. Allen, John A. Hodges, Washington, D.C., for Exxon and Esso Standard Oil.

Jo V. Morgan, and John J. Wilson, Washington, D.C., James M. Tunnell, Jr., and Wm. O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Texaco and Texaco Puerto Rico.

## MEMORANDUM OPINION

FLANNERY, District Judge.

The three above-captioned cases are before the court on cross-motions for summary judgment. Although the cases have not been consolidated, they involve many common questions, have been briefed according to similar schedules, and were argued together on March 17, 1975. This Memorandum Opinion will cover the issues in all three cases, pointing out where necessary those issues that pertain only to certain parties.

These actions all challenge the Federal Energy Administration's [FEA] issuance of a mandatory petroleum price regulation pertaining to the price of petroleum products in Puerto Rico. This court has jurisdiction under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1) (Supp.1975) and section 211 of the Economic Stabilization Act of 1970. The plaintiffs assert that the regulation must be set aside for both substantive and procedural reasons. These challenges raise a host of issues which make simple resolution quite difficult. Accordingly, the court first will review the factual background of these cases and will set forth the procedural posture of each case. Then the court will address the merits of the various challenges.

### I. Factual Background

The Commonwealth of Puerto Rico is uniquely dependent upon petroleum products for its energy needs. Indeed, 99 percent of Puerto Rico's energy is derived from petroleum products and nearly 100 percent of that petroleum is imported from foreign countries, chiefly Venezuela. Historically foreign crude oil has been considerably less expensive than domestic crude oil and in the past Puerto Rico has benefited by having prices lower than those in mainland United States. Thanks at least in part to these lower prices, Puerto Rico, economically the poorest part of the United States, recently has experienced rapid growth at a rate considerably in excess of that in mainland United States. Much of this growth has centered in an extensive petro-chemical and oil-refining industry.

In 1973 world-wide oil prices increased dramatically. Congress, reacting to these price increases and to shortages and threatened shortages of petroleum products, passed the Emergency Petroleum Allocation Act of 1973 on November 27, 1973. In passing the Act Congress determined that there did exist or shortly would exist a critical shortage of petroleum products due to "inadequate domestic production, environmental constraints, and the unavailability of

imports sufficient to satisfy domestic demand . . . ." 15 U.S.C. § 751 (a)(1) (Supp.1975). Congress determined that such shortages had caused or shortly would cause severe economic dislocations and hardships which "jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare . . . ." *Id.* § 751(a) (2)–(3). Puerto Rico specifically was included within the definition of the United States and thus Congress determined that the potential economic crisis due to shortages of petroleum products existed in Puerto Rico. *Id.* § 752(7). Accordingly, to combat this energy crisis Congress directed the President as follows:

> Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. *Id.* § 753(a).

Thus Congress made mandatory that the President both allocate supplies and regulate prices of petroleum products.

Pursuant to this Congressional directive, the President, through his delegate, published proposed regulations and later, on January 15, 1974, issued the mandatory petroleum allocation and price regulations. *See* 39 Fed.Reg. 1923–61 (1974), *codified in* 10 C.F.R. §§ 205, 210–12. Under the petroleum price regulations—the regulations directly in issue in these cases—FEA set up two general pricing rules, the reseller and the refiner. These rules are used to determine the maximum price which a firm may charge for its products and provide for a dollar-for-dollar pass-through of increased product costs. *See* 15 U.S.C. § 753(b)(2)(A) (Supp.1975). When a company that is subject to the refiner rule incurs increased prod-

ucts costs, it must determine the weighted average of all such increased costs and may pass them through equally over its entire distribution system. When a company subject to the reseller rule incurs increased product costs, it may pass its increased product costs directly through to its customers without averaging such increased costs equally through an entire or larger distribution system. Generally, the refiner rule applies to any firm defined as a "refiner," meaning a firm or part of a firm "which refines covered products or blends and substantially changes covered products. . . ." 10 C.F.R. § 212.-31. The reseller rule applies generally to any firm defined as a "reseller," meaning "a firm (other than a refiner or retailer) or that part of such a firm which carries on the trade or business of purchasing covered products, and reselling them without substantially changing their form to purchasers other than ultimate consumers." *Id.* The reseller rule also applied to any entity of a refiner that was engaged in purchasing and reselling covered products, provided that the entity received less than five percent of those products from its parent refiner, and provided "that the entity has historically and consistently exercised the exclusive price authority with respect to sales by the entity." *Id.* § 212.91.

In Puerto Rico there are two main refiners of crude oil—Caribbean Gulf Refining Corporation and the Commonwealth Oil Refining Company [COR-CO]. Under the regulations promulgated by FEA, Caribbean Gulf and CORCO would be treated under the refiner rule. Caribbean Gulf would have to average its increased product costs in with the increased product costs incurred by its parent, Gulf Oil Corporation of the United States. CORCO, however, having no larger distribution system, would be permitted to pass its increased product costs directly to Puerto Rican wholesalers. This situation resulted in Gulf, which refined about 25 percent of Puerto Rico's petroleum products, being re-

quired to sell its refined products at a price considerably below that of CORCO, the seller of about 75 percent of Puerto Rico's refined petroleum products.

This situation was made more complex because certain wholly owned subsidiaries of mainland United States refiners, including Esso Standard Oil S.A., Ltd. [ESSO], subsidiary of EXXON Corporation, Mobil Oil Caribe, Inc. [Mobil Caribe], subsidiary of Mobil Oil Corporation, and Texaco Puerto Rico, Inc. [Texaco P.R.], subsidiary of Texaco, Inc., bought all of their petroleum products from CORCO and were subject to the reseller rule. These subsidiaries, upon purchase of petroleum products from CORCO, could pass on any increased prices that CORCO passed on to them. This would have meant that a large portion of the sellers of petroleum products in Puerto Rico (together the EXXON, Mobil, and Texaco subsidiaries sell about 55–60 percent of all petroleum products sold in Puerto Rico) would have been in a position to pass extremely large price increases directly to the Puerto Rican consumer. These price increases would have been larger than those being incurred in the mainland United States because CORCO depended almost entirely on Venezuelan crude oil for its supplies and the price of that oil had increased from about $3 to over $14 per barrel while the price of mainland crude oil had been held to about $5.50 per barrel. Thus, under FEA's price regulations that were promulgated in January, 1974, Puerto Rico was faced with the prospect of greatly increased fuel costs; some estimates were that gasoline at some retail stations would increase by 17 cents a gallon.

One other seller of petroleum products in Puerto Rico, The Shell Company (Puerto Rico) Ltd., [Shell P.R.], also was a major purchaser from CORCO and also was subject to the reseller rule. Shell P.R. in FEA's opinion was not controlled directly or indirectly by any mainland United States refiner. Thus FEA reasoned that Shell P.R. was sub-

ject to the reseller rule and accordingly after January 15, 1974, was, like the EXXON, Mobil and Texaco subsidiaries, in a position to pass on any increased product costs directly to Puerto Rican consumers. Shell P.R. sold about 18 percent of the petroleum products consumed in Puerto Rico.

FEA, soon after the January 15, 1974 promulgation of the pricing regulations, became concerned about the effect that the application of the reseller rule would have on the Puerto Rican economy. For instance, in March 1974, Shell P.R. and Mobil Caribe attempted to increase prices by 12–14 cents per gallon. Similarly, in February, 1974, the gasoline retailers association decreed a two-day shutdown of gasoline stations to protest the petroleum problem. During that shutdown there also was a major transportation strike, causing severe dislocation in the Puerto Rican economy. FEA began to fear the emergence of a two-tiered pricing structure for fuel in Puerto Rico. FEA reasoned that those few retailers purchasing fuel that had been refined by Gulf would have low prices while the majority, those purchasing fuel refined by CORCO, would have significantly higher prices. In its submission to the FEA, the Commonwealth of Puerto Rico stated:

The retailers with the lower prices would inevitably exhaust their inventory in the first days of the month. Those with higher prices would experience very low sales volumes during these early days, until the low cost products available on the island were exhausted.

Price disparity will cause long lines at gasoline stations, which in addition to causing inconveniences to consumers, causes economic hardships to business purchasers, such as truckers and construction companies which must pay employees to wait in lines to purchase fuel.

By late March, 1974, FEA determined that action should be taken to change the reseller rule as it applied in Puerto

Rico. On March 20, 1974, FEA announced an amendment to its mandatory petroleum price regulations so that those Puerto Rican entities which are owned directly or indirectly by mainland United States refiners were to be subject to the refiner rule, not the reseller rule. FEA found good cause to make this amendment effective immediately. On the same date FEA published notice that it would hold public rule-making hearings in San Juan, Puerto Rico, on April 8 and 9, 1974, for the purpose of determining whether the refiner rule, the reseller rule, or some other pricing regulation should be applied permanently to Puerto Rico. Also on the same date FEA issued a separate order to Shell P. R. requiring it to adhere to its February 22, 1974 prices pending the outcome of the rule-making proceeding. By these combined actions FEA assured that any price increases incurred by CORCO and passed on by CORCO to, *inter alia,* Mobil Caribe, ESSO, Texaco P.R. and Shell P.R., would not be passed on in full to Puerto Rican consumers. Rather, Mobil Caribe, ESSO and Texas P.R. could pass on only such price increases as were allowed under the refiner rule, and Shell P.R. was barred from any further price increases.

FEA published its amended regulations and notice of rule-making on March 27, 1974. Pursuant to those notices many interested parties submitted comments concerning the proposed rule-making and FEA held two days of hearings on April 8 and 9, 1974. On May 20, 1974, FEA published its final mandatory petroleum price regulations applicable to Puerto Rico. *See* 39 Fed.Reg. 17764 (1974). In its first conclusion FEA determined that the refiner rule, not the reseller rule should be applied in Puerto Rico:

> The FEO [now FEA] has concluded that the refiner price rule should be applied in Puerto Rico. The foremost consideration in this regard is the adverse impact that the reseller rule would have on the economy of Puerto Rico.

> The Emergency Petroleum Allocation Act of 1973 included Puerto Rico in the allocation and price regulation system contemplated by the Act, and the need to maintain "equitable" prices for petroleum products in Puerto Rico is particularly acute in view of the nature of the Puerto Rican economy.

> Although Puerto Rico does have a semi-autonomous governmental status, the fact that it has been included in the definition of the United States under the Emergency Petroleum Allocation Act of 1973 means that the averaging of costs in Puerto Rico with costs in the mainland United States cannot properly be regarded as a subsidy, any more than the averaging of costs with respect to one state where costs are high with those of another state where costs are low can be regarded as a subsidy from one state to another.

> The FEO recognizes, however, that the differing treatment of Puerto Rico under the tax laws of the United States results in subjecting increased product cost recoupment revenues to Federal corporate income taxes in the mainland United States, which would not be subject to such taxes in Puerto Rico. The FEO has concluded, however, that the public policy expressed in the Emergency Petroleum Allocation Act of 1973, together with the consistent United States policy of promoting the Puerto Rican economy, favors the conclusion reached here. The tax consequences on each marketing company will vary, depending on its tax situation, and FEO will cooperate with the affected companies in trying to resolve tax problems resulting from this decision. 39 Fed.Reg. at 17765.

With respect to Shell P.R. FEA came to a somewhat different conclusion.

As noted above, Shell (Puerto Rico) is not owned, directly or indirectly by a

mainland United States refiner. Accordingly, it must be treated as a reseller under the price regulations and permitted to pass through its increased product costs in the form of increased prices. In order to avoid the potentially disruptive and chaotic effects in the marketplace of having one marketer with prices substantially in excess of those of the other mark'eters, FEO has determined that it is necessary to require CORCO to adjust its prices to Shell (Puerto Rico) downward, and to permit CORCO to make an upward adjustment in the prices it charges to its other customers, so that it will continue to obtain a dollar-for-dollar pass through of its increased product costs. *Id.*

## II. Procedural Background

Subsequent to issuance of the above-noted regulation, CORCO, as required by the regulation, sought from ESSO, Mobil Caribe, and Texaco P.R. certain information so that it could figure according to a complex FEA formula the amount by which CORCO would have to reduce its price to Shell. Despite the use of the word "permit" with regard to the Shell adjustment, both CORCO and FEA took the position from the beginning that the rule was mandatory in its terms: CORCO was required to lower its prices to Shell and if it raised its prices to ESSO, Mobil Caribe and Texaco P.R. in order to compensate for the Shell reduction, ESSO, Mobil Caribe and Texaco P.R. were required to accept and pay those higher prices.

After the May 20, 1974 publication of the Puerto Rican price regulations, Mobil Caribe, ESSO and Texaco P.R. all observed the refiner rule. Texaco on June 25, 1974, appealed to FEA to set aside the May 20 price regulation; neither Mobil Caribe or ESSO challenged the price regulation at that time. In Summer, 1974, CORCO sent Mobil Caribe and ESSO invoices reflecting the amount they owed CORCO for the Shell adjustment. Both Mobil Caribe and ESSO refused to pay these invoices, contending that the Shell adjustment was invalid. On August 27, 1974, FEA served EXXON and ESSO with a notice of probable violation of the May 20, 1974 regulation. After considerable consultation, FEA issued a remedial order against EXXON and ESSO on October 9, 1974, and, after denying a stay pending appeal, finally rejected EXXON and ESSO's appeal on November 14, 1974. Similarly, Mobil and Mobil Caribe received notice of probable violation on September 3, 1974, and after proceedings similar to those experienced by EXXON and ESSO, finally were denied an appeal on November 19, 1974.[1] Texaco never received a notice of probable violation but its appeal of the May 20, 1974 regulation finally was denied on November 26, 1974.

EXXON and ESSO commenced Civil Action 74–1617 on November 7, 1974, seeking injunctive and declaratory relief that the Shell adjustment of the May 20, 1974 regulation was invalid and that the remedial order and denial of an intra-agency appeal were unsupported by any valid regulation. They moved for a temporary restraining order which was heard and granted on November 15, 1974. In Civil Action 74–1658 Mobil and Mobil Caribe commenced suit on November 14, 1974, seeking not only relief similar to that in Civil Action 74–1617 but also attacking the application of the refiner rule to Puerto Rican subsidiaries of mainland United States oil corporations. They moved for a temporary restraining order which was heard and granted on November 15, 1974. In Civil Action 74–1705 Texaco and Texaco P.R. commenced suit on November 22,

1. Questions have been raised, particularly by Mobil and Mobil Caribe, whether the corporate parents were properly made parties by FEA in the notices of probable violation. Under FEA regulations the parent and the subsidiary constitute part of the same firm and thus the court agrees with FEA that both parent and subsidiary could be noticed for probable violation although only the subsidiary dealt directly with CORCO.

1974, attacking the validity of the Shell adjustment. A temporary restraining order was entered on November 22, 1974.

In each of the three cases presently before the court the parties stipulated to continuation of the temporary restraining orders and set up a briefing schedule for cross-motions for summary judgment. In each of the cases CORCO sought and was granted intervention. Similarly, in each case the United States of America was allowed to intervene solely for the purpose of asserting a counterclaim that the respective defendants be ordered to pay the sums allegedly due to CORCO. The Commonwealth of Puerto Rico intervened only in Civil Action 74–1658. All the parties, including the intervenors, have filed motions for summary judgment and there has been extensive briefing of all issues. In addition, the court heard three hours of oral argument on the various motions. The court finds that there exists no genuine issue as to any material fact and accordingly that these cases are ripe for decision on summary judgment.

### III. Merits of Plaintiffs' Claims

As stated earlier in this Opinion, plaintiffs' challenges fall into two broad categories: first, those challenging the substantive validity of the Puerto Rican price regulation and, second, those challenging the procedures by which that regulation was promulgated. The court first will address the substantive challenges.

### A. Substantive Challenges to Puerto Rican Price Regulations

Before addressing the challenges in detail, the court first shall set forth the scope of judicial review when parties challenge an FEA regulation. Under section 211(d)(1) of the Economic Stabilization Act of 1970 "no regulation . . . shall be enjoined or set aside . . . unless a final judgment determines that the issuance of such regulation was in excess of the agency's

authority, was arbitrary or capricious, or was otherwise unlawful under the criteria set forth in section 706(2) of title 5, United States Code . . . ." In determining whether agency action is arbitrary or capricious, the courts must review the agency record for its decision. The Temporary Emergency Court of Appeals in *Pacific Coast Meat Jobbers Association, Inc. v. Cost of Living Council,* 481 F.2d 1388, 1391 (Em.App. 1973), set forth the proper judicial review as follows:

> In order for this court to affirm the C.L.C. action and the court below, it is not necessary that we decide that the C.L.C.'s action was:
>
> . . . the only reasonable [method], or even that this Court would have reached the same result if the question had arisen in the first instance in judicial proceedings. . . .
>
> In a case such as this the 'judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' (citations omitted).

And the Supreme Court recently has explained the scope of review to be performed:

> Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' The agency must articulate a 'rational connection between the facts found and the choice made.' While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path

may reasonably be discerned. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted).

With the foregoing as background, the court now will address plaintiffs' substantive challenges.

(1) *Challenge to Application of Refiner Rule to Puerto Rican Entities of United States Refiners.*

■■ Mobil and Mobil Caribe challenge FEA's determination to apply the amended reseller rule (meaning the refiner rule) to Puerto Rican entities which are controlled directly or indirectly by mainland United States refiners. The FEA's purpose in applying the refiner rule to these entities is set forth with clarity in the May 20, 1975 regulation. The FEA, after holding hearings and considering comments, concluded that application of the reseller rule in Puerto Rico would have had a severe adverse impact on the Puerto Rican economy, particularly because of threatened inequitable prices. The hearings and written submissions to the FEA set forth in great detail these adverse impacts and the court properly can consider this record in determining whether there exists a rational basis for the FEA decision. *See* 5 U.S.C. § 706 (1970). Primarily, FEA was acting to prevent what it considered inequitable prices which would result in Puerto Rico if CORCO's full product increases were passed on solely within the Puerto Rican market. FEA action to assure equitable prices is squarely within Congress' mandate. *See* 15 U.S.C. § 753(b)(1)(F) (Supp.1975). FEA acted to assure that the effect of the high price of foreign crude oil would be borne not solely by the Puerto Rican economy but rather that, in conformance with the requirements of the Petroleum Act, petroleum products be distributed at equitable prices "among all regions and areas of the United States . . . ." *Id.*

There is ample evidence in the record for FEA to conclude that if Puerto Rico were to bear the full brunt of price increases, there would be severe disruption of the Puerto Rican economy. Already in early 1974 there had been strikes protesting higher petroleum costs. It was clear that for Puerto Rico, 99 percent dependent on petroleum for all of its energy needs, to face huge price increases would have had severe impact on wide branches of Puerto Rico's commercial existence. The court concludes that FEA was correct in acting to avert this type of problem, one clearly within Congress' mandate to the Executive. There may have been other means by which this problem could have been attacked but this court finds that the one chosen by FEA was a reasonable one for which a rational basis exists. *See Pacific Coast Meat Jobbers Ass'n v. Cost of Living Council, supra* at 1391.

■ Mobil and Mobil Caribe also raise a second challenge to the amended reseller rule. Under the Petroleum Act, while FEA is directed to regulate allocation and prices, 15 U.S.C. § 753(a) (Supp.1975), FEA, in specifying the prices for petroleum products, must also "provide for . . . a dollar-for-dollar passthrough of net increases in the cost of crude oil . . . to all marketers or distributors at the retail level . . . ." 15 U.S.C. § 753(b)(2)(A) (Supp.1975). Mobil and Mobil Caribe assert that the amended reseller rule violates the dollar-for-dollar passthrough provision for several reasons. First, Mobil Caribe does not get the full benefit of the dollar-for-dollar passthrough; rather that must be shared with its parent, Mobil Corporation. Second, Mobil asserts that the passthrough is not effective because prices in the United States are so high that Mobil has been unable to passthrough the additional price increases reflected by the Puerto Rican price rules. Third, since Mobil Caribe is a Panamanian corporation, the amended reseller rule has adverse tax ef-

fects. Mobil and Mobil Caribe cannot, under United States tax laws, file consolidated tax returns. This means that when and if Mobil finally is able to pass on the increased product costs incurred by Mobil Caribe, these increased prices shall constitute profit by Mobil, fully subject to United States income taxes. The court is unpersuaded by any of these arguments. First, under FEA rules, Mobil and Mobil Caribe can be considered the same firm. *See* 10 C.F.R. §§ 212.31, 212.83(b). Under these definitions of firms Mobil Caribe is getting the effect of the dollar-for-dollar passthrough when its parent passes on increased costs because Mobil and Mobil Caribe constitute the same firm. Second, the court is unconvinced that Mobil is unable to passthrough the increased costs. Certainly, it may have been unable to do so thus far, but that does not mean that in the future it will be unable to do so. Further, the court agrees with FEA that the Act requires only that FEA provide a reasonable mechanism for this passthrough. The Act does not require that FEA guarantee the effectiveness of the passthrough. *See Gulf Oil Corp. v. F. E. A.*, 391 F.Supp. 856 (W.D.Pa.1975), *appeal pending*, No. 3–6 (T.E.C.A.1975). This agency interpretation of the Petroleum Act, appearing reasonable, is entitled to great deference. *University of So. Cal. v. Cost of Living Council*, 472 F.2d 1065, 1068–69 (Em.App.1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). The court finds that the passthrough mechanism provided by FEA in the instant situation is reasonable and fully implements the Act's provisions. Finally, the court finds no merit in plaintiffs' claims that the passthrough provision violates the Act because it places Mobil and Mobil Caribe in a less favorable tax situation. Nothing in the Act requires that FEA pricing regulations assure favorable tax consequences to firms subject to FEA regulation. The Act only requires that FEA provide for a dollar-for-dollar passthrough of net increases in the cost of petroleum products.[2]

### (2) *Challenges to the Shell Differential.*

All plaintiffs in the three suits under advisement vigorously attack what has been termed the "Shell differential" or "Shell subsidy" provision of the FEA's mandatory pricing regulation. Generally speaking these challenges are three-fold: whether FEA was correct in concluding that Shell had to be treated as a reseller; whether the Shell differential as it pertained to plaintiffs in this case was mandatory or permissive and was meant to override pre-existing contracts; and whether the Shell differential was within the FEA's authority and is supported by a rational basis.

### (a) *Whether Shell had to be treated as a Reseller.*

In its May 20, 1974 regulation FEA states that since Shell Puerto Rico is not owned directly or indirectly by a mainland United States refiner, "it must be treated as a reseller under the price regulations and [be] permitted to pass through its increased product costs in the form of increased prices." Plaintiffs challenge this legal conclusion. To resolve this controversy the court must examine FEA's complex definitions regarding what constitutes a firm. However, first the court considers it helpful to set forth a diagram showing, at least in relevant part, the corporate structure of the affiliated Shell companies. The

---

2. In light of the foregoing findings and conclusions that the FEA amendment of the reseller rule has a rational basis and is fully in accord with the Petroleum Act, the court rejects as insubstantial plaintiffs' arguments that the reseller amendment constitutes a taking without just compensation. *See Delaware Valley Apt. House Owners Ass'n v. United States*, 350 F.Supp. 1144, 1149–50 (E.D.Pa.), *aff'd per curiam*, 482 F.2d 1400 (Em.App., 1973).

percentages shown on this diagram constitute the percentage of ownership that the top company owns over the company at the end of a particular arrow.

Affiliated Holding Companies

(Venezuela Shell sells CORCO crude oil in same amount as CORCO then sells Shell Puerto Rico in refined products)

---

From this diagram it is clear that Shell U.S. and Shell P.R. both are controlled directly by a commonly-held group of parents. If these parents were United States corporations, no doubt FEA would have concluded that Shell P.R. had to be treated under the refiner rule. The question then arises whether under FEA regulations it was proper for FEA to conclude that because of the parents' foreign ownership, Shell P.R. properly was classified as a reseller.

Although the May 20, 1974 regulation lacks somewhat in clarity, the court is able to perceive how FEA arrived at its conclusion that Shell P.R. had to be classified as a reseller. REA's regulations pertaining to allocation of a refiner's increased product costs define firm as a "parent and the consolidated and unconsolidated entities (if any) which it directly or indirectly controls." 10 C.F.R. § 212.83(b). Referring to this definition of firm, FEA then concludes "that Shell P.R. must be controlled directly or indirectly by Shell U.S. before it could be brought within the scope of the refiner pricing rule for the purpose of requiring Shell U.S. to average in the increased costs." Supplemental Brief of the Federal Defendants at 4, filed March 27, 1975. The court, though somewhat uncertain about how FEA defines "indirect control," is willing to accept that Shell U.S. does not control Shell P.R. either directly or indirectly.

Thus, unless FEA's interpretation or application of its regulations is otherwise improper, FEA's decision to apply the reseller rule to Shell P.R. is correct.

One premise underlying FEA's application of its regulations to Shell P.R. merits further discussion. FEA, in deciding whether Shell P.R. could, similarly to Mobil Caribe, Texaco P.R., and ESSO, be subjected to the refiner rule, looked to see whether Shell P.R. was controlled directly or indirectly by a mainland United States refiner. Such a view is not absolutely required. FEA's regulations in 10 C.F.R. § 212.83(b) declare that a firm means a parent and the consolidated and unconsolidated entities which it directly or indirectly controls. The regulation does not state that the parent need be a United States mainland corporation. From the diagram set forth earlier it is clear that under FEA's definition of parent, 10 C.F.R. § 212.31, Royal Dutch Petroleum Company is the "parent" of both Shell U.S. and Shell P.R. Since Royal Dutch Petroleum Company is the parent, both Shell U.S. and Shell P.R. appear to be entities which it directly or indirectly controls. Thus, under FEA's regulations regarding the allocation of a refiner's increased product costs, Royal Dutch Petroleum, Shell U.S., and Shell P.R. are part of the same firm and increased costs could be allocated between all of them. FEA perhaps does not have jurisdiction to force Royal Dutch Petroleum to participate in such an allocation scheme. However, that does not limit FEA, once it determines that Shell P.R. and Shell U.S. are part of the same firm, from ordering those parts of the firm over which FEA has jurisdiction to average costs according to the refiner rule. At oral hearing the government attorney took the position that for FEA to subject Shell P.R. to the refiner rule and to order it to average cost increases with Shell U.S. would have required FEA to exercise control over a foreign corporation. (Tr. 82). However, FEA could look to the foreign structure to determine what con-

stituted a "firm" and then regulate the American parts of that firm according to economic reality. In other situations FEA or its predecessor has looked to a foreign corporation in order to determine the true relationship of American parts of that firm. *See* CLC Ruling 1972–82. Indeed, after questioning by the court, government counsel had to admit that Shell P.R. and Shell U.S. could have been treated together under the refiner rule. (Tr. 90).

■ Despite the preceding, FEA interpreted its regulations differently. For purposes of application of the refiner rule, FEA decided that "parent" must be a United States corporation. FEA persists in this interpretation even though the regulations themselves do not require expressly that the parent be American. The court is of the opinion that the agency interpretation of the statute and its regulations does represent a rational exercise of the powers delegated to it, and that there has been no clear error of judgment. That agency interpretation is not the only rational decision it could have reached and indeed does not necessarily reflect the choice this court would have reached if the court were charged with the initial decision. However, the Temporary Emergency Court of Appeals has cautioned that FEA is to be accorded great deference in its efforts to enforce and implement the Emergency Petroleum Allocation Act. Under these circumstances the court rules that the agency justifiably could conclude that under the Petroleum Act and its regulations Shell had to be treated under the reseller rule.

(b) *Whether the Shell differential is Mandatory as Regards CORCO's Customers other than Shell.*

The amended reseller price regulation requires to CORCO to reduce its price to Shell P.R. according to a formula and permits "CORCO to make an upward adjustment in the prices it charges to its other customers, so that it will continue to obtain a dollar-for-dollar pass-through of its increased product costs."

FEA has interpreted this language to mean that even though certain parties had preexisting contracts with CORCO calling for prices below the price under the original reseller rule, the amended reseller rule overrode those pre-existing contracts, requiring plaintiffs to pay higher prices reflecting the Shell differential. Two basic challenges are raised by plaintiffs: first, by using the word "permits" FEA allowed CORCO to raise its prices if it wanted to but did not require it to and did not require plaintiffs to accept such higher prices; and second, since the regulation did not specifically override pre-existing contracts calling for a lower price than the FEA price, the pre-existing contracts remain in effect.

 It is clear that Congress intended that pre-existing contracts remain in effect under the Petroleum Act to the maximum extent practicable. "FEO regulations preempt or override contracts only to the extent that compliance with existing contracts would constitute a violation of the mandatory pricing regulations." *Trans World Airlines, Inc. v. FEO*, 380 F.Supp. 560, 566 (D.D.C.1974). However, in this case FEA consistently has interpreted the regulation to override pre-existing contracts and price arrangements so that CORCO could obtain its dollar-for-dollar passthrough to the extent of the Shell differential. FEA via interpretation of its regulation, determined that such overriding of existing contracts to that limited extent was necessary under the Petroleum Act. FEA's interpretation of its own regulation is due considerable deference and should not be disturbed if that interpretation is a reasonable one. *University of So. Cal. v. CLC, supra* at 1068–69. The court concludes that FEA need not specifically refer to existing contracts when the regulation in question, by its terms, provides that existing contracts necessarily must be overridden. In this case, the terms of the regulation, upon reasonable interpretation, do provide for overriding the pre-

existing contracts which Esso and Texaco P.R. had with CORCO. The court concludes also that the regulation reasonably intends that any company doing business with CORCO pay its pro rata share of the Shell differential. Since CORCO was required to reduce its price to Shell, it followed logically, in order to implement the passthrough provisions, that it be able to raise its prices to its other customers who, in turn, could pass through those increased prices via the refiner rule.

The court finds it unnecessary to consider whether under FEA's interpretation, FEA could have required ESSO and Texaco P.R. to continue to buy from CORCO at a higher price. However, there is recent precedent which indicates that FEA probably has such authority. *See Condor Operating Co. v. Sawhill*, 514 F.2d 351, 360 (Em.App., Feb. 7, 1975), *cert. denied*, 421 U.S. 976, 95 S. Ct. 1975, 44 L.Ed.2d 467 (1975); *Gulf Oil Corp. v. Simon*, 502 F.2d 1154 (Emp.App., 1974).

(c) *Whether the Shell differential Constitutes Arbitrary and Capricious Agency Action.*

All parties attack the Shell differential, asserting that it is beyond agency authority and that it has no rational basis. To the extent that these attacks focus upon difficulty for plaintiffs in obtaining a cost passthrough and upon the unfavorable tax consequences, the court deems the previous discussion of these matters to apply as well to the challenges under the Shell differential. A more serious problem arises, however, with regard to the agency's determination that "to avoid the potentially disruptive and chaotic effects in the marketplace of having one marketer with prices substantially in excess of those of the other marketers. . . .", the Shell differential would be imposed.

 It is first argued by plaintiffs that FEA has no authority to promulgate a regulation designed to avoid potential disruption in the marketplace.

However, from the Petroleum Act itself, both in Congress' findings, 15 U.S.C. § 751(a) (Supp.1975), and in the goals FEA is told to accomplish to the maximum extent practicable, 15 U.S.C. § 753(b)(1) (Supp.1975), the court concludes that it is within FEA's mandate to seek to avoid market disruption directly related to the petroleum crisis. Any such narrow reading of the Act as plaintiffs would urge would unduly hamper FEA in seeking to carry out Congress' mandate.

Plaintiffs also argue that there is no rational basis for FEA's determination that the Shell differential was necessary in order to avoid the potential chaos of having one marketer with prices substantially in excess of those of other marketers. Plaintiffs argue that even if Shell remained subject to the reseller rule while plaintiffs labored under the refiner rule, the Shell differential was unnecessary because, as a matter of simple economics, Shell would have been unable to raise prices significantly without losing all its business. The court has examined with care the record of these proceedings but is hesitant to substitute its judgment for that of the agency, particularly where complex economic decisions had to be made. The record does indicate that most witnesses did say that it would be impossible for one marketer to remain in the market if all other marketers had significantly lower prices. However, it is apparent from the regulation itself and the complete record of these proceedings, that FEA was not convinced that Shell P.R. could not hold its prices significantly above those of the other marketers. FEA had observed previous-

ly the effort of Shell P.R. and Mobil Caribe to raise prices significantly and obviously was worried that similar efforts might be tried by Shell P.R. alone. Even if ultimately unsuccessful, FEA could reason that in the interim such a two-tiered price system might be chaotic for Puerto Rico. The court emphasizes that in its review of this agency action it need not find that the Shell differential was the only or indeed the most sensible solution to what FEA perceived to be a problem. This court need not even agree with FEA that the Shell situation did constitute a problem. Rather, as stated in *Pacific Coast Meat Jobbers Ass'n v. C.L.C., supra,* the judicial function ends when the court finds a rational basis for the agency action. And this rational basis is not nullified even if it ultimately is decided that a particular agency action was incorrect. *Mandel v. Simon,* 493 F.2d 1239, 1240 (Em.App., 1974). In a similar situation TECA has stated:

> The record demonstrates that CLC had a rational basis for its decision, although it may have made mistakes in predicting economic trends. Mere error in judgment does not destroy the fact that there was a reasonable basis for the decision, and its continuance until September 12, 1973, in view of the short period of time involved and the rapidly changing conditions.

*Western States Meat Packers Ass'n, Inc. v. Dunlop,* 482 F.2d 1401, 1406 (Em. App., 1973). The court concludes that there exists a rational basis for FEA's decision to impose the Shell differential and that the differential is within the broad regulatory authority conferred upon the agency.[3] Similarly, there ex-

---

3. In the cross-motions for summary judgment there was much argument by plaintiffs that defendants were trying to offer posthoc rationalizations for the Shell differential. FEA and the other defendants have suggested as part of the chaos feared by FEA was that Shell P.R., unable to charge higher prices because of competition from plaintiffs, would have decided to leave the market, leaving some 270 branded independent mar-

keters without supply. Plaintiffs argue vigorously that since the May 20 regulation talked only of the danger of a two-tiered price system, the court cannot consider the financial danger to Shell and the retailers as a basis for the regulation. First, the court feels that the rule may be sustained even without reference to the dangers to Shell. However, the court also feels that plaintiffs read the language of the regulation too nar-

ists no violation of due process and no taking of property in violation of the fifth amendment. *See Condor Operating Co. v. Sawhill, supra.*

### B. Procedural Challenges to Puerto Rican Price Regulation.

There are two principal procedural challenges to FEA's action and both deal with the Shell differential. First, all plaintiffs assert that there was inadequate notice of the Shell differential and thus that portion of the regulation must be set aside. Second, Mobil and Mobil Caribe assert that even if there was proper notice of the Shell differential, it was not effective for 30 days by which time Mobil Caribe had ceased doing any business with CORCO. Thus, Mobil and Mobil Caribe assert on this second point that they owe no money to CORCO.

#### (1) Notice of Shell Differential

■ Under 5 U.S.C. § 553(b)(3) (1970), FEA, when giving notice of proposed rule-making, must *inter alia,* state "either the terms or substance of the proposed rule or a description of the subjects and issues involved." An agency can omit this requirement only for interpretative rules, general statements of policy, rules of agency organization, procedure or practice, or when it finds good cause for making a regulation effective immediately. In March 1974 FEA made the refiner rule temporarily effective in Puerto Rico and announced that it would hold rule-making to decide whether "Puerto Rican subsidiaries of refiners should be considered as refiners, as resellers, or should be subject to some other form of price regulation." 39 Fed.Reg. 10454 (March 20, 1974). Interested parties were asked to submit comments and to participate in the hearings. Comments were elicited about cor-

porate structure, historical relations between Puerto Rican entities and their parents, and other factors. *See id.* at 10455. There was nothing in the notice stating that any particular treatment regarding Shell was contemplated. Indeed, under FEA's interpretation, Shell was not considered the "subsidiary of a refiner" and thus the rule-making notice seems on its face to preclude any consideration whatsoever of Shell. Defendants argue that FEA, by stating "some other form of price regulation" gave proper notice of the Shell differential. The court, although mindful that TECA has not required absolute technical compliance by FEA with many requirements of the Administrative Procedure Act, cannot agree with defendants. The notice of March 20, 1974, simply fails to indicate that Shell P.R. even was going to be considered at the hearing. *See Rodway v. United States Department of Agriculture, supra.*

Defendants assert that even if the rule-making notice was inadequate, plaintiffs received actual notice at the hearing which obviates the lack of the other notice. *See* 5 U.S.C. § 553(b) (1970). At the hearing it became obvious that FEA was concerned with the peculiar position of Shell P.R. and the FEA hearing officer on a number of occasions questioned witnesses as to how Shell P.R. could be handled. At one point Mr. Wilson asked in very clear terms whether something along the lines of the Shell differential should be imposed. He said:

> The second alternative was to have CORCO lower its prices to Shell in relation to the prices charged to other companies, in effect spreading the price, the increased cost, through the

---

rowly. Part of the chaos of a two-tiered price system was the financial danger to Shell and the consequent injury to Puerto Rico retailers. There is extensive evidence in the record sustaining such danger. Such material is part of the agency record. *See Rodway v. United States Department of Agriculture,* 514 F.2d 809 (D.C.Cir. 1975).

Thus, the court finds that FEA is not offering new reasons for the regulation but is merely explaining the stated reason. While the stated reason is somewhat lacking in clarity, the court on review of the entire record can discern the agency's path. *Bowman Transportation, Inc. v. Arkansas-Best Freight Sys., Inc., supra.*

other companies through their U.S. Operations. (Tr. Vol. 2, 19–20).

*See also,* Vol. 1, at 28. It appears to the court that at the hearings themselves it should have been obvious to all participants that FEA was extremely concerned about how to handle the pricing of petroleum products by Shell P.R. Indeed, at various times the prospect of the Shell differential was brought up very explicitly. The court concludes that this constitutes actual notice of the subjects and issues involved. Certainly, it would have been better if FEA had given explicit prior notice but it is likely that FEA did not know until the hearing or shortly before it that Shell P.R. would present such a special case. At the hearing FEA did raise the problem repeatedly and, in this court's opinion, sufficiently to meet the requirements of *California v. Simon,* 504 F.2d 430, 440 (Em.App.1974), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294, (1974).

> [T]he procedure in question from the standpoint of substantial statutory compliance, fairness, circumspection, prior notice, opportunity to be heard and abundant record justification, against the background of an embryonic agency faced with complicated takeover tasks under a Congressional deadline, was such as to properly render such mere technical objection unavailing. (footnotes omitted).

This court feels that under all of the circumstances, the imposition of the Shell differential was done fairly. Plaintiffs argue that they should have had an opportunity to point out the irrationality of FEA's decision but given the narrow time schedule involved, the court can understand that FEA in early 1974 was doing the best job it could. TECA has cautioned recently that with regard to future procedural matters, FEA will be required to comply fully with the requirements of the APA. *See Nader v. Sawhill,* 514 F.2d 1064, 1069 (Emp.App. 1974). However, TECA nevertheless has continued to allow considerable lee-

way in reviewing FEA action taken under the Petroleum Act soon after its enactment. This is such a case. Under all the circumstances, plaintiffs did receive adequate actual notice of the Shell differential and, accordingly, the regulation is not defective in that regard.

(2) *Effective Date of Regulation.*

■ Mobil and Mobil Caribe argue that because the May 20, 1974 regulation did not explicitly state that good cause existed to make the regulation effective immediately, the regulation was not effective until June 20, 1974, by which time Mobil Caribe no longer did any business with CORCO. This position must be rejected. In the March 20, 1974 temporary regulation and the notice of rule-making FEA had found good cause to make the regulation effective immediately. While the language of the May 20, 1974 regulation did not make a similar finding, by its terms the regulation required immediate action by the parties. The court concludes that from the findings in the regulation itself the good cause for immediate effectiveness is obvious and that the terms required immediate effectiveness. *See generally California v. Simon, supra; DeRieux v. Five Smiths, Inc.,* 499 F.2d 1321 (Em. App.), *cert. denied,* 419 U.S. 896, 95 S. Ct. 176, 42 L.Ed.2d 141 (1974).

*IV. Conclusion*

These cases have involved many complex substantive and procedural issues, the outcome of which involved very close decisions in certain cases. The court has concluded that in each case summary judgment must be granted for defendants and denied for plaintiffs. Further, the court finds no credible evidence that CORCO failed to comply with FEA regulations and thus concludes that in each case the court should order payment by plaintiffs of the amounts due to CORCO for the Shell differential. The court will enter judgment in the amounts shown to be due by the latest FEA audit. Appropriate judgments accompany this Memorandum Opinion.