TEXACO, INC., et al.,
Plaintiffs-Appellants,

v.

FEDERAL ENERGY ADMINISTRATION
et al., Defendants-Appellees,

United States of America et al.,
Intervenors-Appellees,

The Shell Company (Puerto Rico)
Ltd., Amicus Curiae.

Nos. DC–35–DC–37.

Temporary Emergency Court of Appeals.

Argued Dec. 18, 1975.

Decided Feb. 9, 1976.

Certiorari Denied June 14, 1976.
See 96 S.Ct. 2662.

appellants Texaco, Inc. and Texaco Puerto Rico, Inc.

Andrew J. Kilcarr, of Donovan, Leisure, Newton & Irvine, Washington, D. C., with whom Allan R. Freedman, of Donovan, Leisure, Newton & Irvine, New York City, was on the brief, for appellants Mobil Oil Corp. and Mobil Oil Caribe, Inc.

William H. Allen, of Covington & Burling, Washington, D. C., with whom John A. Hodges, Washington, D. C., was on the brief, for appellants Exxon Corp. and Esso Standard Oil S.A., Ltd.

Paul T. Michael, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees and for the United States as intervenor-appellee.

Benton L. Becker, of Cramer, Haber & Becker, Washington, D. C., with whom Larry M. Lavinsky, of Proskauer, Rose, Goetz & Mendelsohn, New York City, and Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., of counsel, were on the brief, for intervenor-appellee Commonwealth Oil Refining Co., Inc.

Lynn R. Coleman, of Vinson, Elkins, Searls, Connally & Smith, Washington, D. C., with whom Mary Jane Reynolds, Washington, D. C., was on the brief, for intervenor-appellee Commonwealth of Puerto Rico.

Paul J. Mode, Jr., C. Loring Jetton, Jr. and Robert G. Wilson, of Wilmer, Cutler & Pickering, Washington, D. C., on the brief for amicus curiae The Shell Co. (Puerto Rico) Ltd.

Before CARTER, CHRISTENSEN and JOHNSON, Judges.

William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, with whom Richard D. Allen, Wilmington, Del., and Jo V. Morgan, Jr., of Whiteford, Hart, Carmody & Wilson, Washington, D. C., were on the brief, for

CHRISTENSEN, Judge.

These three cases were considered together in the district court and there decided by separate judgments.[1] Now consolidated for the purposes of this appeal, all involve basically the same question: whether a manda-

---

1. *Exxon Corporation et al. v. Federal Energy Admin.*, 398 F.Supp. 865 (D.C.D.C.1975).

tory regulation[2] governing the pricing of petroleum products in Puerto Rico, particularly the exemption of The Shell Company (Puerto Rico) Ltd. [hereinafter Shell, P.R.] from the "refiner" rule and the ordering of related cost-equalization relief against appellants, is invalid, or was for a period ineffective, by reason of procedural or substantive defects.

The district court by summary judgment upheld the regulation and granted implementing money judgments in favor of intervenor-appellee Commonwealth Oil Refining Company, Inc. [CORCO], on its counterclaims and those of the United States on its behalf.[3] We affirm the decision of the district court.

## FACTUAL BACKGROUND

The plaintiffs-appellants are three major oil companies doing business throughout the United States, together with their respective subsidiaries which market petroleum products in Puerto Rico. Puerto Rico, being specifically included within the definition of "the United States" in the Emergency Petroleum Allocation Act of 1973, was within the compass of the Congressional mandate that the President should promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil and its refined petroleum products in amounts and at prices specified in (or determined in a manner prescribed by) such regulation. 15 U.S.C. § 753(a) (Supp. 1975). Such regulation, "to the maximum extent practicable" was to provide for enumerated objectives, including the "preservation of an economically sound and competitive petroleum industry" to "preserve the competitive viability of . . . branded independent marketers"; the equi-

table distribution of refined petroleum products "at equitable prices among all regions and areas of the United States and sectors of the petroleum industry"; and the "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." 15 U.S.C. § 753(b)(1). There was to be provision among other things for "a dollar-for-dollar pass-through of net increases in the cost of . . . refined petroleum products to all marketers or distributors at the retail level." 15 U.S.C. § 753(b)(2).

The agency's regulation set up two general pricing rules, dealing with "refiners" and "resellers" respectively. These rules control the maximum price which a firm may charge for its products and provide for a dollar-for-dollar pass-through of increased product costs. See 10 C.F.R. Part 212. "Refiners" are required to pool their costs of acquiring crude oil and other costs of production and spread them over the production of all their United States refineries in determining their allowable ceiling price for any particular petroleum product. 10 C.F.R. Subpart E. "Resellers" are allowed to pass-through directly to their customers any increases in such costs. Id. Subpart F.

Prior to the promulgation of the amendment hereinafter discussed, the term "reseller" for purposes of Subpart F included in Puerto Rico, as elsewhere, any entity of a refiner which purchased less than 5% of its petroleum products from its parent refiner and which "historically and consistently exercised the exclusive price authority with respect to sales by the entity." 10 C.F.R. § 212.91 (1974).

The following background facts as abstracted from the district court's comprehensive findings will serve to put the ad-

---

2. The regulation in question was issued by the Federal Energy Office, now the Federal Energy Administration (FEA), under The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq. (Supp.1975). The Federal Energy Office became the Federal Energy Administration on June 27, 1974, pursuant to the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 (Supp.1975). References to FEA hereinafter will include FEO during the corresponding time interval.

3. The United States intervened in the district court for the purpose of interposing counterclaims that the respective defendants be ordered to pay sums allegedly due to CORCO, on which there was awarded by the district court a total of approximately $8.5 million with interest.

ministrative action hereinafter discussed in context.

In Puerto Rico there are two main refiners of crude oil—Caribbean Gulf Refining Corporation and the Commonwealth Oil Refining Company (CORCO). Both being within the definition of refiner, Caribbean Gulf had to average its increased product costs in connection with the increased product costs incurred by its parent, Gulf Oil Corporation of the United States; CORCO, however, having no larger distribution system than Puerto Rico, was permitted to pass its increased product costs directly to Puerto Rican wholesalers. This resulted in Gulf, which refined about 25% of Puerto Rico's petroleum products, being required to sell its refined products at a price considerably below that of CORCO, the seller of about 75% of Puerto Rico's refined petroleum products.

Various marketers of petroleum products, including appellants, are located in Puerto Rico as wholly owned subsidiaries of mainland United States refiners. Because these subsidiaries bought practically all of their petroleum products from CORCO, and had historically and consistently exercised exclusive price authority, these marketers, prior to March 20, 1974, were permitted as "resellers" to pass on any increased prices from CORCO directly through to their Puerto Rican customers. These price increases would have been larger than those being incurred in the mainland United States because CORCO depended almost entirely on Venezuelan crude oil [4] for its supplies and the price of that oil had increased from about $3 to over $14 per barrel, while the price of mainland crude oil had been held to about $5.50 per barrel.

Another seller of petroleum products in Puerto Rico is Shell P.R., which also was a major purchaser from CORCO and subject to the reseller rule.[5] Shell P.R. had no mainland parent corporation. It was 99.9% owned by The Shell Petroleum Company Limited, an English company.[6]

During the period following January 15, 1974, when the general FEA regulations became effective, FEA received many inquiries about the extent and scope of their applications. It was informed that retail gasoline prices could rise as much as 17 cents per gallon as compared with mainland prices because Puerto Rico was totally dependent upon foreign crude oil. Domestic crude oil of course was subject to FEA's price controls but the price of foreign crude which has precipitously risen could not be controlled. Because of the cost of foreign oil, CORCO on February 1, 1974, increased the price of gasoline sold to its customers, including the appellant subsidiaries and Shell P.R. by approximately 17 cents per gallon. A two-tier pricing structure developed on the island. The higher price was charged by CORCO which accounted for 80% of all petroleum products consumed in Puerto Rico while the lower price was charged by Gulf, whose refinery generally furnished approximately 20% of all petroleum products.[7] The two-tier system caused widespread disruption.[8]

---

4. Approximately 99% of Puerto Rico's energy needs are derived from petroleum and about 100% of such petroleum is imported from foreign countries, principally Venezuela and Ecuador.

5. Shell P.R. sold about 18% of the petroleum products consumed in Puerto Rico.

6. The Shell Oil Company, a Delaware corporation, had no interest in Shell P.R. Its stock was approximately 30% public owned and 70% held by Shell Petroleum N.V., a Netherlands company. The stock of Shell Petroleum N.V. was owned 60% by Royal Dutch Petroleum Company, the Hague, Netherlands, and 40% by the "Shell" Transport and Trading

Company, Limited, London, England. The Shell Transport and Trading Company, Limited, owned 40% of the Shell Petroleum Co., Ltd. of England and the latter owned 99.9% of the stock of Shell P.R.

7. As has been noted, Gulf was subject to the refiner rule, so that its high cost foreign crude oil was averaged with the cost of lower priced domestic crude subject to United States price controls to make its overall price lower than that of CORCO which used only high cost crude oil.

8. The lower court observed:

. . . [I]n March 1974, Shell P.R. and Mobil Caribe attempted to increase prices by 12–14

On March 20, 1974, FEA announced an amendment to its mandatory petroleum regulations with respect to Puerto Rico. Puerto Rican entities which were owned directly or indirectly by mainland United States refiners were to be subject to the refiner rule, not the reseller rule.[9] The FEA determined that there was good cause to make this amendment effective immediately. At about the same time it published notice that it would hold hearings in San Juan, Puerto Rico, on April 8 and 9, 1974, for the purpose of determining whether the refiner rule, the reseller rule, or some other pricing regulations should be applied permanently to Puerto Rico. Concurrently FEA issued a separate order to Shell P.R. requiring it to adhere to its February 22, 1974, prices pending the outcome of the rule making proceeding. The effect of these actions was to assure that any price increases incurred by CORCO and passed on by CORCO to Mobil Caribe, Esso, Texaco P.R. and Shell P.R., and others in similar positions would not be passed on in full to Puerto Rican consumers. Rather, Mobil Caribe, Esso and Texaco P.R. could pass on only such price increases as were allowed under the refiner rule.

On May 16, 1974,[10] FEA issued its final mandatory petroleum price regulation applicable to Puerto Rico, reading in part:

The FEO [now FEA] has concluded that the refiner price rule should be applied in Puerto Rico. The foremost consideration in this regard is the adverse impact that the reseller rule would have on the economy of Puerto Rico. The Emergency Petroleum Allocation Act of 1973 included Puerto Rico in the allocation and price regulation system contemplated by the Act, and the need to maintain "equitable" prices for petroleum products in Puerto Rico is particularly acute in view of the nature of the Puerto Rican economy.

Although Puerto Rico does have a semi-autonomous governmental status, the fact that it has been included in the definition of the United States under the Emergency Petroleum Allocation Act of 1973 means that the averaging of costs in Puerto Rico with costs in the mainland United States cannot properly be regarded as a subsidy, any more than the averaging of costs with respect to one state where the costs are high with those of another state where costs are low can be regarded as a subsidy from one state to another.

The agency described the mainland Shell Oil Company as:

. . . a Delaware corporation, which does not have any direct or indirect interest in the Shell Company (Puerto Rico), and the stock of which is approximately 30 percent publicly held and 70 percent

cents per gallon. Similarly in February, 1974, the gasoline retailers association decreed a two-day shutdown of gasoline stations to protest the petroleum problem. During that shutdown there was a major transportation strike, causing severe dislocation in the Puerto Rican economy. FEA began to fear the emergency of a two-tiered pricing structure for fuel in Puerto Rico. FEA reasoned that those few retailers purchasing fuel that had been refined by Gulf would have low prices while the majority, those purchasing fuel refined by CORCO, would have significantly higher prices. In its submission to the FEA, the Commonwealth of Puerto Rico stated:

"The retailers with the lower prices would inevitably exhaust their inventory in the first days of the month. Those with higher prices would experience very low sales volumes during these early days, until the low cost products available on the island were exhausted.

"Price disparity will cause long lines at gasoline stations, which in addition to causing inconveniences to consumers, causes economic hardships to business purchasers, such as truckers and construction companies which must pay employees to wait in line to purchase fuel." 398 F.Supp. at 870.

9. "This amendment to 10 C.F.R. 212 is to make clear that the special provisions of that regulation under which certain entities of a refiner may be considered to be resellers shall not apply to any entity of a refiner which operates in Puerto Rico and which is owned or controlled by a refiner that is subject to the price regulations of Subpart E of Part 212 of the Federal Energy Office." 39 Fed.Reg. 10434 (1974).

10. The order was issued May 16, 1974, and published in 39 Fed.Reg. 17764 on May 20, 1974.

owned by Shell N.V., a Netherlands company. (The stock of Shell Petroleum, N.V. is owned 60 percent by Royal Dutch Petroleum Company, The Hague, Netherlands, and 40 percent by the "Shell" Transport and Trading Company, Limited, London, England. The "Shell" Transport and Trading, Limited, London, England, owns indirectly, the Shell Company (Puerto Rico)). . . . 39 Fed.Reg. at 17764.

As to Shell P.R., FEA provided:

As noted above, Shell (Puerto Rico) is not owned, directly or indirectly by a mainland United States refiner. Accordingly, it must be treated as a reseller under the price regulations and permitted to pass through its increased product cost in the form of increased prices. In order to avoid the potentially disruptive and chaotic effects in the marketplace of having one marketer with prices substantially in excess of those of the other marketers, FEO has determined that it is necessary to require CORCO to adjust its prices to Shell (Puerto Rico) downward, and to permit CORCO to make an upward adjustment in the prices it charges to its other customers, so that it will continue to obtain a dollar-for-dollar pass through of its increased product cost. 39 Fed. Reg. at 17765.

Subsequent to issuance of the above-noted regulation, CORCO, as required by the regulation, sought from Esso, Mobil Caribe and Texaco P.R. data so that it could figure according to a complex FEA formula the amount by which CORCO would have to reduce its price to Shell. There is no disagreement among the parties as to the operation of the formula if it were in fact validly promulgated. The appellants refused to pay invoices reflecting the amount they owed CORCO for the Shell adjustment. Notices of probable violations and remedial orders were served by the agency and in due course administrative remedies were exhausted. These actions were then commenced in the district court by the plaintiffs-appellants. The parties stipulated for a continuation of the temporary restraining orders initially entered by the trial court. In each of the cases United States of America was allowed to intervene for the purpose of asserting a counterclaim that the respective defendants be ordered to pay the sums allegedly due to CORCO. The Commonwealth of Puerto Rico also intervened in one of the actions. Cross-motions for summary judgment were filed and the summary judgments followed.

## ISSUES FOR REVIEW

The following issues have been submitted by appellants for review:

1. Whether the FEA gave adequate notice, as required by 5 U.S.C. § 553 for its intention to impose the Shell "subsidy".

2. Whether the FEA's exemption of Shell P.R. from the refiner pricing rule was required or permitted by the FEA's regulations.

3. Whether, assuming the FEA's regulation required or permitted this special treatment of Shell P.R., the provisions of the FEA's order establishing the Shell "subsidy" were nevertheless arbitrary, capricious, an abuse of discretion or otherwise unlawful.

4. Whether the Shell "subsidy" was effective as of publication on May 20, 1974, rather than after the 30-day delay period prescribed by 5 U.S.C. § 553.

## SUBSTANTIVE CHALLENGES

With reference to the appellants' substantive attacks upon the regulations in question, the scope of our judicial inquiry has been repeatedly defined and need not be elaborated upon here. Our province is simply to determine whether the issuance of such regulations was in excess of the agency's authority, was arbitrary or capricious or was otherwise unlawful under the criteria set forth in 5 U.S.C. § 706(2) and section 211(d)(1) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1975). The arbitrary or capricious standard requires a determination whether the decision was based on a consideration of relevant factors, whether there has been a

clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council,* 481 F.2d 1388, 1391 (Em. App.1973). The burden is on the objectors to demonstrate the invalidity of the regulations. *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391 (Em.App.1975); *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 359 (Em.App.1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *American Nursing Home Ass'n v. Cost of Living Council,* 497 F.2d 909, 914 (Em.App.1974).

■ FEA's determination to apply the refiner rule to Puerto Rican entities controlled directly or indirectly by mainland United States refiners was fully justified. The statement of the purposes of that determination contained in the May 16, 1974, regulation in the light of the situation existing in Puerto Rico which has been briefly reviewed, was compelling. The FEA acted to prevent what it considered inequitable prices which would have resulted in Puerto Rico if CORCO's full product increases were passed on solely within the Puerto Rican market. This action was clearly within the authority granted by Congress to assure equitable prices. 15 U.S.C. § 753(b)(1)(F) (Supp.1975). *See Pasco Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975); *Cities Service v. Federal Energy Administration,* 529 F.2d 1016 (Em.App.1975).

The appellants in the present appeals really do not question this, except to contend that Shell P.R. had to be treated in the same way, and particularly that in treating it differently there was no authority nor justification for imposing upon the mainland appellants a burden of cost transfer to their mainland customers. All of appellants attack what has been termed the "Shell differential" or "Shell subsidy" provision (depending usually upon which side is speaking) of the FEA's mandatory pricing regulation. It is contended that the FEA was in error in concluding that Shell P.R. had to be treated as a reseller, rather than a refiner under the broader regulation, and that its differential treatment was beyond FEA's authority, not supported by any rational basis and arbitrary and capricious. We reject these arguments essentially for the reasons stated in the trial court's decision except as noted in the discussion that follows.

Shell U.S. and Shell P.R. are both controlled directly by a commonly held group of parents. If these parents were United States corporations, as the trial court observed, no doubt the FEA would have concluded that Shell P.R. had to be treated under the refiner rule. A problem that obviously troubled the trial court was whether it was consistent with existing FEA regulations to conclude that because of foreign ownership, Shell P.R. should be classified as a reseller. Conceding that Shell P.R. and Shell U.S. could have been treated together under the refiner rule in its literal confines, the trial court looked to differentiating circumstances relied upon by the agency in concluding that for purposes of the application of the refiner rule, the "parent" must be a United States corporation. The trial court in sustaining that interpretation gave deference to the administrative judgment and concluded that the agency's decision did represent a rational exercise of the powers delegated to it and that there was no clear error of judgment. *See University of So. Cal. v. Cost of Living Council,* 472 F.2d 1065 (Em.App.1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). While we are not persuaded that even definitional technicalities would have justified a different interpretation by the agency, we are in full agreement that the administrative determination of the question should be sustained.

■ In view of the interpretation last mentioned, the agency's action was an attempt to equalize the disparity between Shell P.R.'s market prices and those of the other Puerto Rican marketers. To this end, the FEA devised the price adjustment for-

mula[11] based on prices charged by CORCO to all Puerto Rican marketers. Granted that such a solution to a manifest and recognized problem was as a means particularized with reference to a single company, it was nonetheless a rational response to that problem and one which took into consideration the statutory responsibilities of the agency. That the FEA's solution was integrated with a nationwide mechanism rendered it neither irrational nor arbitrary under the circumstances. That there came a time when the agency determined that changed conditions warranted termination of the differential did not make the initial determination capricious or arbitrary in view of the reasonable discretion and presumed expertise of the agency and its unrebutted finding that conditions had in fact significantly changed.

## PROCEDURAL CHALLENGES

■ With reference to the procedural assertions of appellants, the district court concluded that the notice of March 20, 1974, " . . . simply fails to indicate that Shell P.R. even was going to be considered at the hearing."[12] It, however, agreed with the government that since appellants received actual notice at the hearing of the subject matter of the proposed rule, any antecedent technical noncompliance with the Administrative Procedure Act was not fatal. The trial court stated:

> It appears to the court that at the hearings themselves it should have been obvi-

ous to all participants that FEA was extremely concerned about how to handle the pricing of petroleum products by Shell P.R. Indeed, at various times the prospect of the Shell differential was brought up very explicitly. The court concludes that this constitutes actual notice of the subjects and issues involved. Certainly, it would have been better if FEA had given explicit prior notice but it is likely that FEA did not know until the hearing or shortly before it that Shell P.R. would present such a special case. At the hearing FEA did raise the problem repeatedly and, in this court's opinion, sufficiently to meet the requirements of *California v. Simon*, 504 F.2d 430, 440 (Em.App.1974), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). 398 F.Supp. at 881.

Mobil and Mobil Caribe also contended in the trial court, and all of the appellants argue here, that because the May 16, 1974, order did not explicitly direct the immediate effectiveness of the regulation and the existence of good cause therefor, the regulation did not become effective until thirty days after its publication, which would have been June 19, 1974.[13] The district court rejected Mobil's contention.

As to the sufficiency of the initial notice, the trial court accepted appellants' argument that under the FEA's interpretation in applying the reseller rule to Shell P.R., the latter "was not considered the 'subsidiary of a refiner' and thus the rule-making

---

**11.** The formula directed CORCO to adjust its prices to Shell P.R. downward and adjust upward, by proportionate amounts, its prices to its other consumers. Thus, CORCO would continue to obtain a dollar-for-dollar pass through of its increased costs. CORCO's selling price to Shell P.R. for each product during each month was to be the weighted average price at which its products were currently being sold by marketers in Puerto Rico other than Shell P.R., less the January 15, 1974, margin of the latter. Hence, in the last analysis it was not a "subsidy" to Shell P.R., but rather an attempt to assure equitable prices to Puerto Rican consumers. It was, as the affidavit of David G. Wilson, Principal Deputy General Counsel for FEA appropriately summarized in the district court: "The added costs attributable to the

Shell adjustment" was a spreading "into the domestic pricing formula of the major refiners having Puerto Rican marketing entities so that the prices of a major segment of one area . . . would not be inequitably high and so that a major marketing entity in Puerto Rico not owned by a U.S. refiner would not be forced out of business." (R. 847.)

**12.** 398 F.Supp. at 880.

**13.** Texaco and Exxon did not contend before the district court that the order, if otherwise valid, would not have become effective for thirty days. In view of our other conclusions it is unnecessary for us to decide whether they thereby waived consideration of the point here.

notice seems on its face to preclude any consideration whatsoever of Shell" and that "the notice of March 20, 1974, simply fails to indicate that Shell P.R. even was going to be considered at the hearing." 398 F.Supp. at 880. Again, we entertain a somewhat different view. The preclusion seen by the trial court in the notice by technically relating the refiner definition from other context really is not there either from a technical standpoint [14] or by reasonable intendment in view of contemporaneous orders [15] and the surrounding circumstances some of which we have already reviewed.

All of this lent point to the statement in the agency's March 20, 1974, order that "[t]he question of whether certain Puerto Rican subsidiaries of refiners should be considered as refiners, as resellers, or should be subject to some other form of price regulation, involves difficult questions which can best be resolved in a public rule making proceeding." It is true that a solution to these difficult questions was not spelled out in the notice; apparently it could not be, nor did it have to be. There was clear indication, however, that the interim order was not thought by the agency to resolve the questions or to limit the subject matter of the hearing. A hearing apparently was set, rather than merely opportunity for written comments afforded, for the purpose of better exploring solutions within the scope of the subjects described in the notices.[16]

But if there were any insufficiency in the "description of the subjects and issues" to be considered, we agree with the trial court that actual notice on the part of the appellants rendered such deficiency nonprejudicial and reasonably satisfied the requirements of the Administrative Procedure Act.[17]

At the administrative hearing in San Juan on April 8 and 9, 1974, a discussion of the special problem of Shell P.R. fell natu-

14. The notice, 39 Fed.Reg. 10454 (1974), issued on March 18, 1974, and printed March 20, 1974, stated in part:

Notice is hereby given that the Federal Energy Office will receive written comments and hold a public hearing in San Juan, Puerto Rico, with respect to whether certain entities operating in Puerto Rico which are owned or controlled by refiners should be subject to the price regulations applicable to refiners, to the price regulations applicable to resellers, or to some other form of price regulation. By an amendment to the rule with respect to resellers, the Federal Energy Office today has made clear that certain of such entities are subject to the refiner price regulations, and this proceeding is to determine whether that treatment or some other treatment under the Mandatory Petroleum Price Regulations is appropriate.

It is to be observed that the first reference to "certain entities operating in Puerto Rico which are owned or controlled by refiners" is more general than the later reference to "certain of such entities [which by amendment to the reseller rule] are subject to the refiner price regulations." It was with reference to the broader class, which included both Shell P.R. and those certain others subject to the refiner rule, that the issue (of whether the refiner rule, the reseller rule or some other form of price regulation should apply) pertained. The concluding phrase does not change this meaning, since it merely in effect restates that the proceeding is to determine whether the treatment already ordered as to certain of those refiner entities "or some other treatment under the Mandatory Petroleum Price Regulations is appropriate" in consideration of the broader class first mentioned.

15. The agency put into immediate effect an interim order excluding from the reseller rule "any entity of a refiner which operates in Puerto Rico and which is owned or controlled by a refiner that is subject to the price regulations of Subpart E of Part 212 of the Federal Energy Office." 39 Fed.Reg. 10434 (1974). On the same date the FEA issued a separate order to Shell P.R. freezing its prices pending the outcome of the rule making proceeding.

16. There were two notices, one from which a quotation already has been set out in note 14, supra, and one fixing the time of the hearing. 39 Fed.Reg. 11314 (March 27, 1974).

17. With reference to rule making, 5 U.S.C. § 553 presently provides in pertinent part:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

rally, indeed unavoidably, into the context of the discussions. Not only was the subject fully explored as a problem requiring solution within the scope of the hearing, but full opportunity was afforded for comment by the representatives of appellant. In fact, a proposal was advanced for discussion quite similar to the particular solution of the Shell P.R. problem finally adopted by the agency. The trial court in its opinion referred briefly to some of these instances. In view of the appellants' renewed contentions that these represented merely general or passing comments without fair indication that they concerned a problem to be treated by the prospective regulation, we refer to the record in more detail.

The affidavit of Noel Totti, Jr., Managing Director of Shell P.R., which appears as part of the record in all three actions, supplements and clarifies the transcript of the hearings before the administrative agency as a result of the March, 1974, notices. The presence of representatives of all of the appellants at the time of each of the statements hereafter recited was alleged upon information and belief by Mr. Totti. Those allegations have not been questioned by appellants.[18]

On April 8, 1974, Esso's representative, Mr. Griffith, testified. At the completion of his prepared testimony Mr. Wilson of the FEA General Counsel's Office, who presided over the hearings, said:

. . . When we amended the price regulations in March to require rolling in, one of the companies that did not, the principal company that did not fall under that formula was Shell Puerto Rico. And this I might point out was due to its peculiar corporate structure and the fact that the parent would be outside the United States.

Would you have any recommendations as to how we should treat Shell Puerto Rico, which if it were not treated specially, would end up charging something like 17 cents above all the other companies in Puerto Rico?

Mr. Griffith responded, "Well, I think I would just prefer not to comment on Shell's situation. . . ."

Mr. Wilson asked a similar question at the conclusion of the testimony of Martin Brinitzer, Manager of Compania Petrolera Chevron, another marketer of petroleum products in Puerto Rico (subsidiary of Standard Oil of California). Mr. Brinitzer responded: "No, I can't really offer a solution to that particular problem other than to revert to a noncontrol situation."

At the conclusion of testimony by Elliott M. Mager, CORCO's Vice President of Planning and Economics, Mr. Wilson asked the following question:

. As you know, the emergency allocation act of 1973 requires a dollar for dollar pass-through for all companies, which means essentially that when you buy crude oil, if the price goes up you are allowed to pass that through as a refiner. However, one of the problems that we seem to have in Puerto Rico is that fact that some or many of the companies that are operating in Puerto Rico operate under different corporate structures, which would affect the rules under which they will in turn pass through the costs. What would be your reaction to trying to alleviate this condition by changing the prices which Corco charges to the various companies that are retailing in Puerto Rico?

Mr. Mager responded that he would be concerned with administrative difficulties "unless this was controlled directly by some higher authority." Mr. Wilson went on to say:

. . . of course you could not do this on your own, otherwise you would be in violation of the Energy Office regulations as they now stand, but what I am suggesting for your comment is some sort of order by the FEO that would adjust

---

**18.** Inquiry of counsel for appellants from the bench during oral argument confirmed the accuracy of Mr. Totti's representations.

prices charged to companies operating in Puerto Rico.

Mr. Mager responded:

> . . . other than what I have said so far I really don't feel I can make any further contributions with specific recommendations.

On April 9, 1974, Mr. Totti himself testified on behalf of Shell P.R. Among other things he said:

> As we have mentioned before in the case of The Shell Company (Puerto Rico) Limited which does not have the corporate capability to average in with a parent U.S. refiner, it is our opinion that in order to maintain an economically viable operation we must be granted an allocation to buy product from a supplier whose price structure already reflects the averaging in feature, or alternatively, that Corco be required to sell to us at lower prices to permit us to be competitive while recovering the normal mark up.

Following this testimony, Mr. Wilson commented:

> The second alternative was to have Corco lower its prices to Shell in relation to the prices charged to other companies, in effect spreading the price, the increased cost, through the other companies through their U.S. operations.

At the conclusion of the prepared testimony of Mr. Morefield, General Manager and President of Mobil, Mr. Wilson questioned the feasibility of treating all corporate entities operating in Puerto Rico in the same manner:

> But won't this result in different treatment within Puerto Rico unless we do look behind the actual corporate structure of some of the corporations operating in Puerto Rico? Won't this cause the differences in price of, you know, some 17 cents or so that exists in Puerto Rico?

Mr. Morefield's answer was that all such entities should be treated either as resellers or as "independent refiners" which would have had the same effect.

At the opening of the hearing on April 8, 1974, if not common knowledge in the industry before, it was specifically revealed by the representative of Shell P.R. that in view of its status as a reseller and in order to mitigate the substantial losses being suffered, it had attempted to increase its selling price on March 18, 1974, to pass its higher product costs on to its customers despite the uncompetitive situation in which it would be placed. This increase, however, was rescinded on March 21, 1974, by a separate order of the FEA which directed that it make no further price increases without FEA approval.

At the outset in opening the hearing the presiding officer stated that at the conclusion of all the oral presentations each person who had given statements would be given an opportunity to make a rebuttal statement. At the close of the hearings it was announced that interested parties would be allowed until April 15, 1975, to submit additional written statements. None of the appellants availed itself of these opportunities with respect to the Shell P.R. problem. Appellants filed no statements concerning the Shell P.R. situation at any time before the regulation was issued.

Appellants argue that even though notice to the extent required by the Administrative Procedure Act (APA) had been received at the time of the hearing, it would have been insufficient as a matter of law because of its timing. They cite *In re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), in support of their argument that "notice that comes only during the hurly-burly of a hearing is at best an inadequate substitute for the advance notice that enables one to prepare for the hearing."

The kind of hearing referred to in *In re Gault* of course was entirely different. In the type of rule making with which we are concerned,[19] a formal hearing is not man-

---

**19.** Section 207(a) of the Economic Stabilization Act of 1970, Pub.L. 91–379, as amended, Pub.L. 92–210 and Pub.L. 93–28, continued in effect by Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq.,

dated by the APA,[20] and no specific period of notice of the rule making is there specified. Manifestly, reasonable notice is contemplated by the statute, the rule making proceedings being the critical event and reasonable opportunity for comment and the submission of data by interested parties the crux of the requirement. The proceedings here originated with the original March notice, and culminated in the promulgation and publication of the mandatory regulation in May. We conclude that in the course of that proceeding, appellants received fair and reasonable advance notice of the subjects and issues finally covered by the regulation as it affected them in relation to Shell P.R. and that they were afforded fair and reasonable opportunity for comment and the submission of data in substantial compliance with the requirements of the APA. *Cf. California Citizens Band Assn. v. United States*, 375 F.2d 43 (9th Cir.), *cert. denied*, 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

■ Appellants' contention that in any event the regulation in question did not become effective until thirty days following its publication is based upon 5 U.S.C. § 553(d).[21] The regulation did not expressly provide that it was to be effective immediately upon publication, nor did it expressly relate statements in the rule that may have indicated good cause for making it immediately effective to any such intent.

However, there obviously was good cause for the regulation to be made effective immediately, and by clear implication when the text of the Order and the related circumstances of record are looked to that was its intent.

The March 20 interim regulation recognized the urgency of the general problem and by its terms was made effective immediately. Its purpose was indicated as being to preserve the existing price structure pending resolution of the rule making proceedings initiated by the notices mentioned. The April hearing demonstrated the continuing urgency of the entire problem, including the situation of Shell P.R. The mandatory regulation resulting from the hearing referred to the need to maintain equitable prices as being "particularly acute in view of the nature of the Puerto Rican economy." To avoid the market disruption which had been arrested by issuing almost simultaneously the March 20 interim amendment and the Shell P.R. freeze order, it seems evident that it was necessary to make the Shell differential effective immediately upon recognition of Shell's right to operate under the reseller rule. In describing the lawful base price that it could charge, the regulation allowed Shell P.R. to include an amount representing unrecouped product costs incurred between January 15 and May 15, 1974. Evidently it was anticipated that no such amounts would accrue after May 15 because May 16 was the date the regulation was promulgated.

In addition to the treatment of the Shell P.R. situation, the mandatory regulation as a result of urging by the oil companies authorized appellants to establish the base prices of their products in accordance with profit margins applicable on January 15, 1974, rather than the May 15, 1973 margins which were applicable prior to May 16.[22] There is indication in the record, and during oral argument the assertion of CORCO's counsel to the same effect was not questioned by counsel speaking for all of the

rendered 5 U.S.C. § 553 applicable to FEA's rule making.

**20.** 5 U.S.C. § 553(c). "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. . . . "

**21.** 5 U.S.C. § 553(d) provides:

The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
(3) as otherwise provided by the agency for good cause found and published with the rule.

**22.** None of the published notices which preceded the April hearings contained any reference to the possibility that such a change would be made. This subject seems to have been less implicit in the March notices than the Shell issue.

appellants, that appellants acted upon this feature of the regulation as being effective without delay by raising their prices accordingly. In any event, Mobil's contention that the Shell provision was not similarly effective originated only after Mobil was billed by CORCO months later,[23] and Exxon and Texaco apparently did not perceive any problem as to immediate effectiveness until after these cases had been tried in the district court.

We conclude in view of all of the circumstances of record, as did the trial court, that this was not a case of any substantial departure from the requirements of the APA or prejudice from technically flawed procedures, and that it falls within the principle and reasoning of *Nader v. Sawhill*, 514 F.2d 1064 (Em.App.1974); *California v. Simon*, 504 F.2d 430 (Em.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974); and *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321 (Em.App.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). *Cf. Shell Oil Company v. FEA*, 527 F.2d 1243 (Em.App.1975); *Tasty Baking Company v. Cost of Living Council*, 529 F.2d 1005 (Em.App.1975), which involved significantly different circumstances.

The judgments below are affirmed.

---

23. Mobil terminated purchases from Shell P.R. within the 30-day period. The other appellants continued to purchase from CORCO. Sustaining of appellants' position as to the 30-day delay would place upon CORCO, having immediately complied with the order for reduction of prices to Shell P.R., the entire burden of the Mobil assessment and substantial portions of those against the other mainland appellants, disrupting the pass through mechanism provided by the regulation for that period.